FILED

2005 Apr-21  PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| ANGELA M. HOUSE, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.:  2:04-CV-0349-RDP |
| | } | |
| LIFE INSURANCE COMPANY OF | } | |
| NORTH AMERICA, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court is Defendant Life Insurance Company of North America's ("LINA")

Motion for Summary Judgment (Doc. #16) filed on January 12, 2005.  Plaintiff filed her Complaint

on February 23, 2004, seeking insurance benefits pursuant to an accidental death policy under an

Employee Retirement Income Security Act of 1974 or "ERISA"-governed plan.  (Doc. #1).   In

addressing Defendant's summary judgment motion, this court must determine which standard of

review applies and decide whether Plaintiff is entitled to ERISA benefits.  As discussed more fully

below, the court finds that there are no material factual disputes and that LINA is entitled to

judgment as a matter of law.  Accordingly, LINA's Motion for Summary Judgment is due to be

granted.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating

a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

### III.    STATEMENT OF FACTS[1]

LINA insured the group accidental death and dismemberment component of the Southern Company's Employee Welfare Benefit Plan (the "Plan").  (AF No. 1.1).  Coverage under the policy of insurance (the "Policy") was made available to eligible employees, including Plaintiff's Decedent. (AF No. 1.2).  Under the Policy, designated beneficiaries, whose claims were approved and accepted, were due to receive $300,000 in benefits.  (AF No. 1.3).

The Policy contains language that states, in bold face print on the cover page, that "**THIS IS A LIMITED POLICY**" and further that "**THIS IS AN ACCIDENT POLICY WHICH DOES NOT PAY BENEFITS FOR LOSS FROM SICKNESS.**"  (AF No. 2.1).  The Policy pays benefits under the following conditions:

> We agree to pay benefits for loss from bodily injuries:
>
> a)      caused by an accident which happens while an insured is covered by this policy; and
> b)      which, directly and from no other causes, result in a covered loss (see the Description of Coverage).
>
> We will not pay benefits if the loss was caused by:
>
> a)      sickness, disease, or bodily infirmity; or
> b)      any of the Exclusions listed in the policy.

(AF No. 2.2).  In addition, the exclusions section of the Policy expressly provides that: "No benefits will be paid for loss resulting from … sickness, disease or bodily infirmity."  (AF No. 2.3).

Decedent suffered from insulin-requiring type II diabetes which resulted in a multitude of health problems including retinopathy, nephropathy, and gastropathy, as well as neuropathy.  (AF

---

[1]The court's statement of facts is based upon a review and comparison of the facts included in Doc. #17, Doc. #19, and Doc. #22.  The acronym "AF" stands for admitted fact.

No. 3.1).  She was described by John Day, M.D. as having "advanced diabetes and multiple end-organ problems associated with it." (AF No. 3.2).  Decedent's additional health problems ranged from hypertension, migraine headaches, depression, hypercholesterolemia and nephritis to gastroparesis and esophageal reflux.  (AF No. 4).

Plaintiff's Decedent required hemodialysis three times a week for her end-stage kidney disease.  (AF No. 5.1).  As of 2000, Decedent was for all practical purposes restricted to her home given her multiple medical problems and rigorous dialysis schedule.  (AF No. 5.2).

The medical records collected in connection with Plaintiff's claim further revealed that Decedent's health had been precarious for an extended period of time and that the topic of refusing life-saving measures had been previously considered.  (AF No. 6.1).  She had a history of going into a catatonic state in which she would be unresponsive and shaky.  (AF No. 6.2).  For example, Plaintiff's Decedent spent roughly ten days in the hospital in the Fall of 2000 for what was described as an "altered mental status".  (AF No. 6.3).  At this time, Dr. Lee documented the following:

> The patient's mental status improved only slightly during the initial two-thirds of her hospital stay.  It was felt her prognosis was very poor with long discussion made with her family.  It was unanimous with the family members as well as the patient that patient be continued as do not resuscitate with no mechanical ventilation or advanced cardiac life support protocols.

(AF No. 6.4).  In fact, Dr. Lee, Plaintiff's Decedent's treating physician, transcribed a conversation with Decedent in which "[t]he patient … would ask that if her condition is deemed terminal that no extraordinary measures be performed to prolong her life . . . ."  (AF No. 6.5).  Nasrollah Eslami, M.D., a neurologist who was consulted during this hospital stay, concluded that "given multiple medical problems … the prognosis for recovery is poor."  (AF No. 7.1).  Leland Allen, M.D., an

infectious disease specialist who examined Plaintiff's Decedent prior to her admission, similarly described her as being in "her usual state of fairly poor health."  (AF No. 7.2).

On September 27, 2000, and again on April 25, 2001, Plaintiff's Decedent was diagnosed with renal failure.  (AF No. 8.1).  Dr. Tim Christopher, a surgeon, described Decedent as being in "relatively poor health" having chronic renal failure which progressed to end-stage renal disease.  (AF No. 8.2).  Plaintiff's Decedent's renal deterioration required her to undergo a series of procedures to create a permanent hemodialysis access site on her arm.  (AF No. 9.1).  The first port site proved unworkable as Plaintiff's Decedent experienced diminished activity and no flow in the graft.  (AF No. 9.2).  Therefore, Dr. Christopher performed another procedure and created an upper arm graft.  (AF No. 9.3).

Dr. Lee's treatment notes reveal that Plaintiff's Decedent was not following the diet regimen required of diabetics and therefore her blood sugars were fluctuating.  (AF No. 10.1).  In May 2001, Dr. Lee noted "[b]lood sugars have wide swings lately due to inconsistent eating habits.  (AF No. 10.2).  He also stated that "Patient's mother is adjusting her morning 70/30 insulin based on sliding scale! Blood sugars have been up as high as 400 in recent past.  Has had problems with hypoglycemic episodes.  Not compliant with any diet!" (AF No. 10.3).  In August 2001, Decedent spent four days in the hospital followed by an extended care unit rehabilitation after suffering a stroke.  (AF No. 11.1).

On the morning of April 2, 2002, Plaintiff's Decedent slipped and fell at home in her kitchen.  (AF No. 12.1).  She was diagnosed with a pelvic fracture.  (AF No. 12.2).  Dr. Lawrence Lee met Plaintiff's Decedent at the hospital and conducted an examination.  (AF No. 13.1).  His notes indicate that Plaintiff's Decedent "will initiate physical therapy and occupational therapy . . . ." (AF

6

No. 13.2).

Plaintiff's Decedent's medical records upon admission for her fall in the kitchen relating to her kidney-condition include the following notations: "Will consult Nephrology Associates to assist me with the patient on hemodialysis."; "Will continue the patient on all of her other home medications."; "Will also begin pattern blood sugars with sliding scale insulin." (AF No. 14.1). The same radiology report revealing her pelvic fracture, also detected a three centimeter rounded calcific density which Daniel W. Thompson, M.D., opined could be a calcified renal cyst or possibly a splenic artery aneurysm. (AF 15.1).

Plaintiff's Decedent was discharged on April 12, 2002 to an extended care unit in fair condition. The discharge note by her treating physician, Dr. Lee, described plans for her future: "Will continue physical therapy and occupational therapy in Extended Care Unit with plans to hemodialysis as an outpatient." (AF No. 16.1). A radiology report taken approximately two weeks after her fall indicates that there was no bone encroachment on adjacent nerve roots and that the hips appear "unremarkable." Also, the radiologist found that Decedent's blood was flowing well and that there was no evidence of deep vein thrombosis. (AF No. 17.1).

Dr. Lee's medical records from Shelby Baptist Medical Center detail how Plaintiff's Decedent's decision to cease hemodialysis led to multi-organ collapse and congestive heart failure causing death:

> Pain management was very difficult, and the patient was very uncooperative with physical therapy and was making very poor progress. The patient's condition continued to deteriorate despite aggressive measures. The patient eventually refused hemodialysis. After long discussions with patient and her family, it was decided the patient would be made do not resuscitate. Eventually the patient's therapy was discontinued. The patient's AV graft had clotted.

7

> However, the patient refused to have this repaired and refused all hemodialysis. The patient was begun on comfort measures … the patient eventually expired on 4/22/02 with multi-organ collapse and congestive heart failure.

(AF No. 18). The certificate of death issued by the Shelby County Health Department lists the immediate cause of death as "endstage renal disease" due to (or as a consequence of) pelvic fracture. (AF No. 19.1). Dr. Lawrence who completed the certificate, identified the manner of death as "natural cause." (AF No. 19.2).

On August 6, 2002, Plaintiff submitted a claim for accidental death benefits. Plaintiff described the accident as follows: "The accident occurred in her home while trying to get something out of the refrigerator in the kitchen. (AF No. 20.1). She fell, fractured her pelvis was carried to Shelby Medical Center via ambulance where she remained until her death on April 23, 2002, due to pain she was unable to continue dialysis treatments." (AF No. 20.2).

Following its claim adjudication process, LINA communicated its denial of the claim by letter to Plaintiff dated March 19, 2003. (AF No. 21.1). Through counsel, Plaintiff appealed LINA's decision on July 9, 2003. (AF No. 22.1). In the appeal letter, Plaintiff admitted that after ceasing hemodialysis, Plaintiff's Decedent "subsequently suffered multiple organ failure and passed away on April 23, 2002." (AF No. 22.2). Upon Plaintiff's appeal of the denial, LINA upheld its decision to deny Plaintiff's claim for benefits as communicated in a letter to Plaintiff dated July 15, 2003. (AF No. 23.1). LINA maintained its position that Plaintiff's Decedent's death failed to satisfy the Policy's requirement of causation by an accident "directly and from no other causes" and that the disease exclusion of the Policy also precluded recovery of benefits. (AF No. 23.2).

Through a letter from her counsel, Plaintiff requested a second appeal on July 28, 2003.  (AF No. 24.1).  In this letter, counsel stated "the death certificate signed by Dr. Lee clearly supports Mrs. House's legal position.  The immediate or final cause of death is listed as end stage renal disease.  However, the 'underlying cause' or the 'injury that initiated events resulting in death' is listed as pelvic fracture."  (AF Nos. 24.2-4).  Plaintiff was afforded a second appeal.  (AF No. 24.5).

In connection with LINA's second review of Plaintiff's Claim for Benefits, LINA retained Todd Broome, M.D., with the Kidney and Hypertension Center of North Alabama through UNIVAL, to review the medical records of Decedent.  (AF No. 25.1).  Relevant portions of Dr. Broome's findings follow:

> Following review of these extensive records, it is apparent that Ms. Payne was a profoundly debilitated 50-year-old white female with multiple advanced complications and comorbidities including end-stage kidney disease, which appeared to be directly or indirectly related to her type II diabetes.  It is also clear that she suffered greatly as a result of her multiple medical problems, which were further compounded in September 2000 when she reached the point of end-stage kidney disease and required initiation of renal replacement therapy in the form of hemodialysis.
>
> There is no question that her kidney disease was clearly active at the time of her fall by virtue of the fact that she had been established to have end-stage kidney disease and was continuing to receive dialysis therapy at the time of her admission.  In my opinion, her end-stage kidney disease contributed both directly and indirectly to her death and clearly was the primary final cause of her death based on the fact that dialysis is a life-sustaining therapy, without which most patients will die within a matter of days as a direct result of metabolic complications of end-stage kidney disease.

(AF No. 25.2).

Plaintiff's counsel corresponded with Dr. Broome and discussed his opinion with him.  Later, counsel memorialized their conversation in a letter.  (AF No. 26.1).  In that letter, counsel said

"[a]ccording to your conversation with Mr. Rockefeller [Plaintiff's counsel], you noted it is not uncommon for a single event, e.g., an accidental injury such as the one at issue in this matter, to set in motion a chain of events that ultimately leads to the death of an individual suffering from such comorbidities." (AF No. 26.2).  Also, counsel admitted "[y]ou will note on the death certificate that the immediate or final cause of death is listed as end stage renal disease." (AF No. 26.3).

In connection with the second review of Plaintiff's claim for benefits, her counsel submitted to LINA a report from a retained expert, Jack Moncrief, M.D., of Austin, Texas.  (AF No. 27.1).  Dr. Moncrief opined that "[b]ecause of the severity of her symptoms and the inability to adequately control her pain she decided to terminate her dialysis support and subsequently died of uremia." (AF No. 27.2).  He continued, "[t]he fall and subsequent complications produced an unbearable situation and precipitated her decision to terminate dialysis care.  (AF No. 27.3).  It is unlikely that she would have decided to terminate dialysis had the fall and pelvic fracture not occurred."  (AF No. 27.4).

## IV.    ANALYSIS

### A.    ERISA Standard of Review

During the briefing stage, the parties disputed which ERISA standard of review the court should apply.  LINA maintained that the court should use a modified arbitrary and capricious standard[2] citing to the discretionary authority language contained in the summary plan description

_____

[2]The Eleventh Circuit has crafted a "modified" or heightened standard of review in an effort to account for the possible conflict of interest.  *See Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1159, 1562-63 (11th Cir. 1990), *cert. denied*, 498 U.S.1040 (1991).  According to *Brown*, under the modified arbitrary and capricious standard, the first step is to determine – from the perspective of *de novo* – whether the fiduciary's interpretation of the disputed contract provision was legally correct or legally wrong. *Brown*, 898 F.2d 1556, 1567 n.12.  If the court determines that the interpretation advanced by the fiduciary is legally correct, there is no need for further consideration of a possible conflict of interest.  *See HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993-94 (11th Cir. 2001); *Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d

(the "SPD").[3]  Plaintiff, on the other hand, pointed to the Eleventh Circuit's decision in *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1282-84 (11th Cir. 2003) (outlining the framework for determining appropriate standard of review and applying *de novo* review in context of policy that lacks express grant of discretionary authority by amendment or otherwise despite summary plan description that incorporates discretionary language), and argued that the court should apply a *de novo* standard of review.

At the hearing held on April 19, 2005, LINA conceded that the appropriate standard for the court to use in evaluating Plaintiff's claims for benefits in this case is the *de novo* standard.  As LINA aptly stated during oral argument, because the record presently before the court does not include any evidence of an express grant of discretionary authority contained in the Plan, the *de novo* standard is applicable.

### B.    Application of the *De Novo* Standard of Review

The court now turns to LINA's decision to deny accidental death benefits to Plaintiff and reviews that determination on a *de novo* basis.[4]  In accordance with the Eleventh Circuit's decision

---

541, 544 (11th Cir. 2000) ("It is important to note that where the district court agrees with the ultimate decision of the administrator, it will not decide whether a conflict exists."); *Adams v. Thiokol Corp.*, 231 F.3d 837, 843 (11th Cir. 2000); *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir. 1997) ("If the administrator's interpretation was correct, then the inquiry ends.").

[3]More specifically, the SPD provides LINA with discretionary authority to find facts and construe terms: "The Plan Administrator (or, for insured plans, the insurer) of each Plan (or its delegate) has the exclusive discretionary authority to: interpret the Plan[,] decide all questions of eligibility for benefits[, and] determine the amount of these benefits[.]"  (Doc. #18 at Ex. B at Ex. A at "PLAN ADMINISTRATOR DISCRETION").

[4]In *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004), the Eleventh Circuit set forth a six-step model for use in judicially reviewing virtually all ERISA denials:

in the strikingly similar case of *Dixon v. Life Insurance Company of North America,* 389 F.3d 1179 (11th Cir. 2004), the court is persuaded that because Plaintiff is unable to show that Decedent's pre-existing conditions did not "substantially contribute" to her demise, LINA's decision to deny accidental death benefits is a correct one and is due to be upheld on summary judgment because under controlling law no reasonable trier of fact could find in favor of Plaintiff.

### 1.    Background of the "Substantially Contributed" Test

In *Dixon*, the plaintiff, Annie Dixon, in her capacity as her husband's beneficiary, filed a claim for accidental death benefits under a group accident policy issued by LINA after her husband died in a single car accident. *Dixon*, 389 F.3d at 1180. LINA denied the claim on the basis that Mr.

---

(1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision; if it is not, then end the inquiry and affirm the decision.

(2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)    If there is no conflict, then end the inquiry and affirm the decision.

(6)    If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams,* 373 F.3d at 1138 (footnotes omitted).

12

Dixon's death was not "caused by an accident" but resulted from "other causes" as defined in and excluded by the policy. *Id.* It was undisputed from the record evidence that Mr. Dixon died at the time, or shortly after, his car ran off the road into an embankment. *Id.* at 1180-81. An eyewitness to the accident saw Mr. Dixon's car leave the road, checked Mr. Dixon's pulse immediately after the accident and was unable to detect a heartbeat. *Id.* at 1181. The paramedics who arrived at the scene unsuccessfully administered CPR and Mr. Dixon was pronounced dead upon arrival at the hospital. *Id.* It was undisputed that the cause of Mr. Dixon's death was heart failure. *Id.* However, the parties disputed the relationship between the car accident and Mr. Dixon's heart failure. *Id.*

Mr. Dixon's death certificate identified the cause of death as an "accident." *Dixon*, 389 F.3d at 1181. Moreover, the certificate described the injury as occurring due to a "motor vehicle accident." *Id.* However, the death certificate identified the "immediate cause" of Mr. Dixon's death as "Thrombotic Occulusion, Circumflex Coronary Arterie (*sic*)." *Id.* The death certificate further noted as an "other significant condition" that the motor vehicle accident was a "contributing factor." *Id.* In addition to the language from the death certificate, the Georgia Bureau of Investigation Division of Forensic Science's medical report stated that the cause of death was "cardio arrhythmia" due to "atherosclerotic and hypertensive heart disease." *Id.* It was also noted in the medical report that there was no evidence of external injury to Mr. Dixon. *Id.* The Georgia State Medical Examiner provided several pathologic diagnoses in his report, including specifically: "I. Complete atherosclerotic and thrombotic occlusion, circumflex coronary artery. II. Hypertensive cardiovascular disease, with advanced left ventricular hypertrophy. III. Atherosclerosis of aorta, mild to moderate. IV. No evidence of trauma involving the central nervous system, spine, thorax or abdomen. V. History of motor vehicle accident." *Id.* In conclusion, the medical examiner stated

13

that Mr. Dixon:

> [D]eveloped a sudden heart rhythm disturbance, as a consequence of complete blockage of one of the main arteries that supplies blood to the heart, accompanied by severe hypertensive cardiovascular disease.  However, immediate prior to his death, the decedent was involved in a motor vehicle accident . . . . The manner of death is accident.

*Id*.

In addition to the death certificate and other conclusions supplied by state agencies, both the plaintiff and the insurer retained experts to consider the evidence.  The plaintiff retained a practicing cardiologist from Emory University Medical School, Dr. Gordon Brandau, who reviewed the medical evidence and concluded:

> Mr. Dixon died a sudden cardiac death due to coronary atherosclerotic heart disease and hypertensive cardiovascular disease.  From eye witness reports … Mr. Dixon's car was run off of the road by a truck traveling at a high rate of speed.  It is my opinion that this emergent situation caused severe emotional and physiological stress precipitating Mr. Dixon's sudden cardiac arrest, and thereby, directly and accidentally causing Mr. Dixon's death.

*Dixon*, 389 F.3d at 1181.  By contrast, the insurer retained a forensic pathologist, Dr. James Lewis, who opined that the "cause of death was consistent with an acute coronary thrombosis due to atherosclerotic cardiovascular disease due to hypertensive cardiovascular disease . . . . [T]he manner of death in this case is natural."  *Id*.

Upon thorough consideration of the evidence submitted by the parties, the district court granted the insurer's motion for summary judgment, concluding that the language of the policy[5] unambiguously precluded recovery "unless the loss resulted 'directly' from an accident and 'from no other causes.'"  *Id*. at 1182.  As it was undisputed that Mr. Dixon's heart condition contributed

---

[5]As discussed in more detail below, the policy involved in the *Dixon* case was also issued by LINA.

to his death, the district court found no reasonable fact finder could conclude that his death resulted

from an accident and no other causes.  *Id.*  The plaintiff appealed the decision to the Eleventh Circuit

Court of Appeals.

After surveying jurisprudence construing the language of ERISA–covered accident policies,

and identifying a split of authority among the circuit courts, the *Dixon* court expressly adopted the

reasoning of the Fourth Circuit in *Adkins v. Reliance Standard Life Ins. Co.*, 917 F.2d 794, 797 (4th

Cir. 1990).  *Dixon*, 389 F.3d at 1184.  In doing so, it followed the *Adkins* holding that a "pre-existing

infirmity or disease is not to be considered as a cause unless it substantially contributed to the

disability or loss." *Dixon*, 389 F.3d at 1184; *see also Quesinberry v. Life Ins.Co. of N. Am.*, 987 F.2d

1017, 1028 (4th Cir. 1993).  The "substantially contributed" test, according to the *Dixon* court, gives

meaning to the exclusionary language without unreasonably limiting coverage[6] and while

simultaneously advancing ERISA's purpose of promoting the interest of employees and their

beneficiaries.  *Dixon*, 389 F.3d at 1184.

Upon adoption of the "substantially contributed" test, the *Dixon* court determined that it

would not consider Mr. Dixon's pre-existing heart disease as a cause unless it substantially

contributed to his death.  *Dixon*, 389 F.3d 1179 at 1184.  Conducting a *de novo* review of the medical

---

[6]The Sixth and Tenth Circuits have held that the words "directly and independently from all other causes" were not ambiguous and imposed two obvious conditions.  First, the loss must result directly from an accidental bodily injury and, second, must result independently of all other causes.  If a death occurs from a combination of a pre-existing disease or bodily infirmity, as well as injuries sustained in an accident, there must be a finding of no coverage, as any other result would be "contrived."  *Dixon*, 389 F.3d at 1183 (citing *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000) and *Criss v. Hartford Life & Accident Indem. Co.*, 963 F.2d 373 (6th Cir. 1992) (unpublished decision)).  The *Dixon* court reasoned that such an overly strict interpretation of "directly and from no other causes" would provide coverage only where the insured was in perfect health at time of an accident.  *Id.* at 1184.

evidence submitted to and considered by LINA, the *Dixon* court found that the undisputed evidence showed that Mr. Dixon's heart failure was directly due to his atherosclerotic and hypertensive heart disease. *Id.* Thus, the record evidence was not disputed that Mr. Dixon's pre-existing heart condition "substantially contributed" to his death regardless of whether the auto accident was the immediate cause and that it triggered his heart attack. *Id.* at 1184-85. On this basis, the Eleventh Circuit affirmed the district court's summary judgment in favor of LINA.

### 2.    Application of the "Substantially Contributed" Test

The *Dixon* court construed the language of a virtually identical group accident insurance policy (which it found unambiguous) issued by Life Insurance Company of North America, the defendant in this case. The terms and conditions language for which benefits would be payable for a covered loss is identical, as is the exclusions.

Also, just as in the *Dixon* case, the overwhelming medical evidence as set forth in the statement of facts shows that Plaintiff's Decedent's end-stage kidney disease and longstanding renal failure cannot be eliminated as conditions which substantially contributed to her death. For example, on September 27, 2000, and again on April 25, 2001, Decedent was diagnosed with renal failure. (AF No. 8.1). Also, Dr. Tim Christopher, a surgeon, described Decedent as being in "relatively poor health" having chronic renal failure which progressed to end-stage renal disease. (AF No. 8.2).

Moreover, Dr. Lee's medical records from Shelby Baptist Medical Center describe in detail how Plaintiff's Decedent's decision to cease hemodialysis led to multi-organ collapse and congestive heart failure culminating in her death. (AF No. 18). Furthermore, the certificate of death issued by the Shelby County Health Department lists the immediate cause of death as "endstage renal disease" due to (or as a consequence of) pelvic fracture. (AF No. 19.1).

16

Plaintiff's Decedent's fall and resulting injuries appear to have been part of the underlying circumstances leading up to her death.  However, Plaintiff's position in support of coverage argues that Plaintiff only has to show "but for" causation, which is clearly insufficient under the Eleventh Circuit's analysis.  More specifically, Plaintiff's argument as to the connection between Plaintiff's Decedent's injuries and her death is simply off the mark in light *Dixon*.  It is instructive that Plaintiff and her counsel acknowledged during the claims process that the fall precipitated a "chain of events" that led to Decedent's **death from renal failure**.  (AF No. 26.2; AF No. 26.3) (emphasis added).  Therefore, because Plaintiff is unable to show that Decedent's pre-existing condition of end-stage renal disease did not "substantially contribute" to her death, LINA's decision to deny accidental death benefits was proper.

In opposing summary judgment, Plaintiff advances one argument that was not addressed in the *Dixon* decision.  She argues that the SPD made available to Plaintiff's Decedent and the Policy contradict each other in the area of accidental death and that this ambiguity precludes the entry of summary judgment in favor LINA.[7]  (Doc. #19 at 10-11; Doc. #23 at 3-7).  Plaintiff also attempts

---

[7]The relevant language included in the SPD is: "benefits will be paid in the event an accidental injury results in death or dismemberment within 12 months after the accident." (Doc. #18 at Ex. B at Ex. A at "AD&D BENEFITS COVERAGE").  By comparison, the coverage provision contained in the Policy is:

> We agree to pay benefits for loss from bodily injuries:
>
> a)     caused by an accident which happens while an insured is
>        covered by this policy; and
> b)     which, directly and from no other causes, result in a covered
>        loss.  (See the Description of Coverage.)

We will not pay benefits if the loss was caused by:

to distinguish *Dixon* to avoid its application.  (Doc. #19 at 16).  The court is not persuaded by either of these arguments.

The specific phrase with which Plaintiff takes issue is "directly and from no other causes", which is in the Policy, but not in the SPD.  However, rather than creating any inconsistency or ambiguity, the court views this phrase as an amplification or clarification of what type of accidental loss is specifically covered under the Policy.  *See Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1024 (7th Cir.) (determining that policy provisions defining injury in context of accidental death "to mean bodily injury caused by an accident and resulting directly and independently of all other causes" operate to clarify rather than to contradict corresponding section of summary plan description), *cert. denied*, 525 U.S. 947 (1998).  Because the court is able to read the two documents in conjunction with each other, and because the purpose of a summary plan description is not to exhaustively describe coverage, but rather to succinctly summarize the rights and obligations of plan participants and their beneficiaries under a policy, the court finds the SPD and the Policy are not inconsistent and accordingly, must reject Plaintiff's argument.[8]  29 U.S.C. § 1022; *see Branch v. G. Bernd Co.*, 955 F.2d 1574, 1579 (11th Cir. 1992)

_____

a)      sickness, disease, or bodily infirmity; or

b)      any of the Exclusions listed in the policy.

(Doc. #18 at Ex. A at Ex. 2 at 1).

[8]Additionally, the court notes that even if it were to have concluded that a contradiction in the language existed, Plaintiff lacks evidence of any reliance, a showing which is required in the Eleventh Circuit.  *See Branch*, 955 F.2d at 1579 (requiring beneficiary to prove reliance on summary plan description in order to prevent administrator from enforcing inconsistent terms of plan); *Liberty Life Assurance Co. v. Kennedy*, 358 F.3d 1295, 1302 (11th Cir. 2004) ("Reliance is relevant only when an estoppel principle is present, such as when an employee asserts he or she is entitled to benefits under the language of a summary plan description and the employer contends that a plan document controls and precludes benefits.").  Accordingly, Plaintiff's claim would not survive

(describing requirement that employers provide "their employees with accurate and understandable summary plan descriptions . . . .") (citations omitted). Therefore, there are no material factual disputes, and LINA is entitled to judgement as a matter of law.

## V.    CONCLUSION

As analyzed above, as no reasonable trier of fact could conclude on the record taken in a light most favorable to Plaintiff that Decedent's death was accidental and that her pre-existing condition of end-stage renal disease did not "substantially contribute" to her death, LINA's decision to deny

---

summary judgment for this reason, also.  To the extent that Plaintiff reads *Jones v. American Gen. Life and Accident Ins. Co.*, 370 F.3d 1065, 1069 (11th Cir. 2004) to invalidate the reliance rule as described in the *Branch* and *Kennedy* decisions in the context of Plaintiff's § 502(a)(1)(B) benefits claim, the court disagrees.  Instead, *Jones* generally describes the types of claims available under § 502(a)(1)(B) and should not be misinterpreted as an overhaul of prior § 502(a)(1)(B) opinions addressing the element of reliance in the context of contradictory language.  In fact, the very case upon which Plaintiff relied during oral argument, *McKnight v. Southern Life & Health Ins. Co.*, 758 F.2d 1566 (11th Cir. 1985), actually enunciated a reliance standard when a conflict exists between the language of a plan and the summary in the context of an employee's quasi-contractual claim for retirement benefits:

> Although Southern Life submits that both the plan and submits that both the plan and summary are consistent, Southern Life asserts that if a conflict arose between the plan and the summary, the plan should prevail.  Such an assertion defeats the purpose of the summary.  It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan.  Unfairness will flow to the employee for **reasonably relying** on the summary booklet.
>
>        . . . .
>
> We hold that McKnight is entitled to employment credit for his pre-1971 periods of employment.  As a Southern Life employee, McKnight was justified in **relying** on the summary booklet to determine his pension rights.  The district court reasonably interpreted the summary provision.

*Id*. at 1570, 1571 (emphasis added).  Therefore, Plaintiff's failure of proof as to the element of reliance, whether by her or by Plaintiff's Decedent, is fatal to her claim for different benefits coverage because of the less detailed language in the SPD.

benefits was correct, and summary judgment is due to be entered in favor of LINA.

   **DONE** and **ORDERED** this ___21st___ day of April, 2005.

                                        **R. DAVID PROCTOR**
                                        UNITED STATES DISTRICT JUDGE